1  Glenn E. Westreich (State Bar No.100457)
   gwestreich@nixonpeabody.com
2  Beth L. Mitchell (State Bar No. 187460)
   bmitchell@nixonpeabody.com
3  Rosalyn P. Mitchell (State Bar No. 173829)
   rmitchell@nixonpeabody.com
4  NIXON PEABODY LLP
   One Embarcadero Center, Suite 1800
5  San Francisco, CA  94111
   Telephone:  (415) 984-8200
6  Facsimile:  (415) 984-8300

7  Michael St. James (State Bar No. 95653)
   ST. JAMES LAW, P.C.
8  155 Montgomery Street, Suite 1004
   San Francisco, CA  94104
9  michael@stjames-law.com
   Telephone:  (415) 391-7566
10 Facsimile:  (415) 391-7568

11 Attorneys for Defendants/Cross-Claimants
   JOHN M. AND FLORENCE E. BRYAN
12 TRUST

13

14              **UNITED STATES DISTRICT COURT**

15            **NORTHERN DISTRICT OF CALIFORNIA**

16

17   In re                  Case No. 05-14659

18   THE LEGACY ESTATE GROUP, LLC,          **DECLARATION OF JOHN BRYAN IN**
19   formerly doing business as FREEMARK     **SUPPORT OF DEFENDANTS' MOTION**
     ABBEY WINERY, BYRON VINEYARD &          **TO WITHDRAW REFERENCE**
20   WINERY, and ARROWOOD VINEYARD &
     WINERY
21
22      Debtor

23                    Adv. No.  06-01173

24   OFFICIAL COMMITTEE OF UNSECURED
25   CREDITORS OF THE LEGACY ESTATE
     GROUP, LLC,
26
27                    Plaintiff,

28          v.

1  INVESTMENT FUND LTD, a British Columbia
2  company, HARRY CHEW, and AIC CAPITAL
   PARTNERS, LLC, a California limited liability
3  company.

4       Defendants.

5
   AND RELATED CROSS-CLAIM.
6

7

8       I, John M. Bryan, declare as follows:

9       1.   I make this declaration of my own knowledge, and if called as a witness I could and

10  would competently testify as follows:

11      2.   I am the trustee of the J.M. Bryan Family Trust ("JMB Trust") and I am a co-trustee of

12  the John M and Florence E Bryan Trust ("J&FB Trust") (collectively referred to as the "Bryan

13  Trusts").

14      3.   Pursuant to a March 14, 2005 Units Purchase Agreement between the Bryan Trusts

15  and Connaught ("UPA"), Connaught agreed to purchase the Bryan Trusts' interests in Legacy for

16  $8,677,610. Pursuant to Schedule 1.1 of the UPA; of the $8,677,610 amount, $4,186,050 was to be

17  paid to the J&FB Trust and $4,491,560 to the JMB Trust. A true and correct copy of the March 14,

18  2005 UPA is attached hereto as Exhibit A.

19      4.   Pursuant to the terms of the UPA, on or about March 16, 2005, the sum of

20  $7,169,173.21 in cash was delivered to the Bryan Trusts (the "Transfer").

21      5.   The payment in the amount of $7,169,173.21 was divided relatively evenly and

22  distributed simultaneously to the JMB Trust and the J&FB Trust.

23      I declare under penalty of perjury and the laws of California and the United States of America

24  that the foregoing is true and correct.

25

26  Dated this 22 day of May, 2007.            By:   _John M. Bryan_
                                                     JOHN M. BRYAN
27

28

DECLARATION OF JOHN BRYAN IN SUPPORT OF          -2-                              10586901.1
DEFENDANTS' MOTION TO WITHDRAW REFERENCE

**EXHIBIT A**

## UNITS PURCHASE AGREEMENT

This Units Purchase Agreement ("Agreement") is made as of March 14, 2005, by Connaught Capital Partners, L.L.C. ( the "Buyer"), and the John M. and Florence E. Bryan Trust and the J.M. Bryan Family Trust (collectively the "Sellers").

### RECITALS

A.   Sellers own 8,457.78 Units of ownership in The Legacy Estate Group LLC (the "Company") which owns and operates a winery under the name Freemark Abbey Winery, in St. Helena, California.

B.   Buyer owns 1,288.89 Units of ownership in the Company.  In a separate agreement, Buyers entire Membership Interest is being acquired by AIC Capital Partners LLC ("AIC") immediately prior to the closing of this sale. Buyer's managers, who are full time active management employees of the Company, are acting in this transaction with the full consent and knowledge of the Sellers.

C.   Sellers desire to sell, and the Buyer desires to purchase, all of the Sellers' Units in the Company, for the consideration and on the terms set forth in this Agreement.

### AGREEMENT

The parties, intending to be legally bound, agree as follows:

1.   SALE AND TRANSFER OF UNITS; PURCHASE PRICE

1.1   SALE AND PURCHASE OF THE UNITS

Subject to the terms and conditions of this Agreement, at the Closing, Sellers will sell and transfer the Units to Buyer, and Buyer will purchase the Units from Sellers. The Units being sold and the purchase price payable to the respective Sellers is set forth on Schedule 1.1.

1.2   CALCULATION AND ALLOCATION OF THE PURCHASE PRICE

The purchase price (the "Purchase Price") for the Units will be Eight Million Six Hundred Seventy Seven Thousand Six Hundred Ten Dollars ($8,677,610.00).

1.3   PAYMENT OF THE PURCHASE PRICE

1.3.1   The Purchase Price shall be paid by wire transfer or bank cashier checks at the Closing.

1.3.2   Buyer was unable to obtain the release of the guaranty by John M. and Florence E Bryan ("Bryan's Guaranty") of the

1

Company's obligations under its Agreement for Purchase and Sale of Grapes with Red Barn Ranch LLC dated 8/31/2001 ("Grape Purchase Agreement"). At the Closing of this Units Purchase Agreement Buyer shall deliver to the Sellers its Guaranty Agreement (in the form attached as Exhibit A hereto) and a comparable Guaranty Agreement and Pledge Agreement (in the forms attached as Exhibits B and C hereto) from AIC Capital Partners,LLC to assure the Company's performance under the Grape Purchase Agreement so that the guarantors under the Bryan's Guaranty will never have to perform hereunder.

1.3.3    Buyer was unable to assume the existing Term Loan that Company has with the Mechanics Bank nor obtain the release of the Sellers guaranty of that Term Loan. To enable the prompt closing of this sale transaction so Buyer can conclude other pending purchase transactions, the J.M. Bryan Family Trust ("Bryan Trust") is purchasing the Mechanics Bank Term loan position on the condition that the Company, Buyer or AIC Capital Partners buy out the Term Loan position at par plus expenses from the Bryan Trust or pay off the Term Loan by July 10, 2005. This loan purchase transaction is reflected in a Loan Purchase Agreement between the Bryan Trust and the Mechanics Bank, a Bryan Intercreditor Agreement and Amendment No. 1 thereto, copies of which have been delivered to Buyer and to Company.

1.4    PAYMENT OF EXISTING PROMISSORY NOTES

Buyer is unable to fund the Company sufficiently at the time of Closing for Company to pay off the J.M. Bryan Family Trust's outstanding loans to Company in the approximate amount of $3,795,000 as at the date hereof. The J.M. Bryan Family Trust has consented to postpone the payment upon receipt of a promissory note from Buyer to cover this liability in the form attached as Exhibit D which note will be secured by a pledge of all of AIC's ownership interest in Buyer in the form of the Pledge Agreement attached as Exhibit E. The Exhibit E pledge shall be the sole priority over the Exhibit C pledge . AIC agrees not to issue any other pledges of its membership interests in the Buyer to anyone other than to an affiliate of John Bryan.

2.    DELIVERIES AT CLOSING

2.1    At the Closing, the Sellers will deliver to the Buyer:

(i)    Assignment instruments confirming the transfer of their Units to Buyer; and

2

(ii)     The original Bryan Trust Notes

2.2     At the Closing, the Buyer will deliver (or cause to be delivered) to the Sellers:

(i) Eight Million Six Hundred Seventy Seven Thousand Six Hundred Ten Dollars for the Units.

(ii) the Guaranty Agreement in favor of John M. and Florence E Bryan (the "Bryans") from Buyer and the Guaranty Agreement and Pledge Agreement from AIC Capital Partners, LLC in favor of the Bryans

(iii) the Promissory Note from Buyer and the Pledge from AIC in the forms of Exhibits D and E; and

(iv) a fully executed copy of the Bryan Intercreditor Agreement and Amendment No 1 thereto.

3.     REPRESENTATIONS AND WARRANTIES OF SELLERS

3.1     GENERAL PROVISIONS

3.1.1   To induce Buyer to enter this Agreement to purchase the Units for the consideration provided for in this Agreement, Sellers make to Buyer the representations and warranties set forth in this Section 3 as of the date of the Closing.

3.1.2   Sellers' representations and warranties are subject to the exceptions specifically noted in the Disclosure Letter delivered by the Sellers to the Buyer prior to the Closing and by this reference incorporated in and made a part of this Agreement.

3.1.3   Except as otherwise provided herein, as to representations, warranties, and covenants in this Agreement which are limited to Sellers' "knowledge", or which are limited only to "known" matters, such limitation shall mean the actual knowledge of Steven Cousins and/or John M. Bryan.

3.1.4   No representation or warranty is made by the Sellers of any kind as to any opinions, estimates, or projections for past or future performance which may have been provided to the Buyer regarding the Company other than the representations and warranties made in this Agreement.

3.2     ORGANIZATION; BOOKS AND RECORDS

3.2.1   The Company is duly organized, validly existing, and in good standing under the laws of the State of California and has all requisite power and authority to operate the business of the Company.

3

3.2.2  Sellers have made available for inspection by the Buyer the originals or accurate copies of the Articles of Organization and the Operating Agreement of the Company, as currently in effect (the "Organizational Documents").

3.3    SELLERS' AUTHORITY; NO CONFLICTS

3.3.1  This Agreement and all other agreements or instruments contemplated to be executed in connection with the transactions covered by this Agreement have been (or upon execution will have been) duly executed and delivered by Sellers, and constitute (or upon execution will constitute) legal, valid and binding obligations of Sellers.

3.3.2  Neither the execution and delivery of this Agreement nor the consummation of any of the transactions contemplated by it do or will, directly or indirectly (with or without notice or lapse of time or both), (i) contravene, conflict with, or result in a violation of (A) any provision of the Organizational Documents of the Company, or (B) contravene, conflict with, or result in a violation of, or give any governmental body or other person the right to challenge any of the transactions contemplated by this Agreement or to exercise any remedy or obtain any relief under, any legal requirement or any order to which the Company, or any of the assets owned or used by the Company, is or may be subject, except those which would not prevent the Company from performing its obligations under this Agreement in any material respect, and those which could not reasonably be expected to, individually or in the aggregate, adversely affect the Company in any material respect.

3.3.3 The Sellers are not and will not be required to obtain any consent from any person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated by this Agreement.

3.4    CAPITALIZATION

The authorized and issued equity securities of the Company consist of 9,746.67 Units of ownership. Sellers are and will be on the Closing Date the record and beneficial owner and holder of the 8,457.78 Units to be transferred hereunder, which Units are held free and clear of all liens, claims, and encumbrances. All of the outstanding Units of the Company have been duly authorized and validly issued and are fully paid and nonassessable. There are no contracts in which the Sellers or the Company is a party which relate to the issuance, sale, or transfer of any equity Units or other securities of the Company. The Company does not own, nor has any contract to acquire, any equity securities or other securities of any person or any direct or indirect equity or ownership interest in any other business other than its ownership Units in Highland Estate LLC and its ownership in Wine Storage Lanes.

4

3.5    COMPANY ASSETS

. The Sellers make no representation or warranty as to the condition of the real estate, the improvements thereon, fixtures, equipment, and inventory of the Company, and the Sellers expressly disclaim any other express or implied warranties, including those of merchantability or of fitness for a particular purpose.

3.6    LITIGATION; JUDGMENTS

There are no claims, disputes, legal or equitable actions, proceedings or investigations of any nature, to Sellers' knowledge, pending or threatened involving Seller (whether as plaintiff, defendant, or otherwise) with respect to the Company or the Company's business. There are no judgments, orders, decrees, or restrictions with respect to the Company.

3.7    COMPLIANCE WITH LAW

To the knowledge of the Sellers, the Company has not violated, and on the Closing Date shall not have violated, any applicable federal, state, or local laws, the enforcement of which would have a material and adverse effect on the ownership or use of the Company's assets or the operation of its business.  No material default has occurred in the Company's due observance of any condition to any certificate, permit, or license required for the ownership or operation of any of the Company's assets.

3.8    TAXES

3.8.1  The Company is classified as a limited liability company under California law and has reported as a partnership for the purposes of federal and state income taxation.  The Sellers note, however, that if the Buyer is the sole Unit holder after the Closing, the Company will no longer be treated as a partnership for tax purposes and the Buyer is advised to seek advice from its own tax advisors as to tax compliance and reporting requirements which must be followed after the Closing.

3.8.2  The Company has filed or caused to be filed all tax returns that are or were required to be filed by it pursuant to applicable legal requirements.  All tax returns filed by the Company were (and, as to tax returns not filed as of the date hereof, will be) in all respects true, complete and correct and filed on a timely basis.  The Sellers will cooperate with the Buyer as to the filing after the Closing Date of tax returns covering periods through the Closing Date as provided in Section 11.11.

3.8.3  Except for sales taxes owed through the Closing Date, the Company has paid, within the time and in the manner prescribed by law, and, until the Closing Date will have paid within the time and in the manner prescribed by law, all taxes that were due and payable through the Closing Date.

5

3.8.4  The Company has complied (and until the Closing Date will comply) with all applicable laws, rules and regulations relating to the payment and withholding of taxes and has, within the times and in the manner prescribed by law, withheld from employee wages and paid over to proper governmental authorities all amounts required.

3.8.5  No tax return filed by the Company is under audit or examination by any taxing authority, and no written or unwritten notice of such an audit or examination has been received by the Company and, the Sellers have no knowledge of any threatened audits, investigations or claims for or relating to taxes, and there are no matters under discussion with any taxing authority with respect to taxes.

3.8.6  There exists no proposed assessment of taxes against the Company.

3.8.7  No encumbrance for taxes exists with respect to any assets or properties of the Company, nor will any such encumbrances exist at the Closing Date except for statutory liens for taxes not yet due.

3.8.8  The Company has not requested any extension of time within which to file any tax return, which tax return has not since been filed.

3.8.9  The Company has not executed any outstanding waivers or comparable consents regarding the application of the statute of limitations with respect to any taxes or tax returns.

3.8.10 The Company has made available to the Buyer complete and accurate copies of all tax returns, and any amendments thereto, filed by or on behalf of the Company, for the years ended 2001, 2002, & 2003.

3.9     NO UNDISCLOSED LIABILITIES

The Company has no known liabilities or obligations of any nature, except for the liabilities reflected in its December 31, 2003 Balance Sheet and obligations incurred since that date incurred in the ordinary course of its business. Copies of the Company's unaudited financial statements at December 31, 2004 have been delivered to Buyer.

3.10    LABOR RELATIONS

The Company is not a party to, or bound by, any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization.  To the knowledge of Sellers, no complaint, charge or legal proceeding by or before any governmental body brought by or on behalf of any employee, prospective employee, former employee, retiree, labor organization or other representative of its employees is pending or threatened against the Company.

3.11    BROKERS OR FINDERS

Sellers and their agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

3.12    NO KNOWN, MATERIAL MISSTATEMENTS OR OMISSIONS OR MATERIALLY ADVERSE EFFECTS

Neither this Agreement nor the Disclosure Letter contains any known untrue statement of a fact or omits any known fact necessary in order to make the representations and warranties contained herein and therein not misleading that could have a material adverse effect on the Company.

3.13    DISCLAIMERS

No representations or warranties are made by Sellers with respect to the Units, the Company, or its assets or liabilities except as expressly set forth in this Article 3.


4.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.1    ORGANIZATION AND GOOD STANDING

Buyer. is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of California.

4.2    AUTHORITY; NO CONFLICT

4.2.1  This Agreement constitutes the legal, valid, and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms. Upon the execution and delivery by the Buyers of any other agreements or documents required to be signed and delivered by the Buyer pursuant to this Agreement (collectively, the "Buyer's Closing Documents"), the Buyers' Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against the Buyer in accordance with their respective terms. The Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents.

4.2.2  Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the transactions contemplated in this Agreement by Buyer will give any person the right to prevent, delay, or otherwise interfere with any of those transactions pursuant to:

(i) any provision of a Buyer's Organizational Documents;

(ii) any resolution adopted by the managers or members of the Buyer;

(iii) any legal requirement or order to which Buyer may be subject.

4.2.3    Buyers are not and will not be required to obtain any consent from any person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated by this Agreement.

4.3    INVESTMENT INTENT

Buyer is acquiring the Units for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.

4.4    CERTAIN PROCEEDINGS

There is no pending legal proceeding that has been commenced against the Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement.  To Buyer's knowledge, no such legal proceeding has been threatened.

4.5    BROKERS OR FINDERS

Buyer and its agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Seller harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

4.6    BUYERS' INDEPENDENT INVESTIGATION

Buyer acknowledges and agrees that its managers have been active in the management of the Company and that they are relying on their own independent investigation of the contracts, books and records, and other financial, operating, and other data and information about the Company.  Buyer further acknowledges and agrees that it is not relying on any statements, projections, or estimates of sales, expenses, operations, or performance, which may have been obtained through the Sellers or included in the information provided by the Sellers to the Buyer.  In particular, the Buyer has satisfied itself as to the current operations, sales volume and expenses of the Company.

4.7    ASSETS ACCEPTED IN "AS-IS" CONDITION.

Buyer acknowledges and confirms that it has had an opportunity to make an independent inspection of the real estate, the improvements thereon, fixtures, equipment, and inventory of the Company, and acknowledges that it is acquiring

8

the Sellers' Units with the understanding that these assets at the Closing Date will be in their "as-is" condition as of the date of signing of this Agreement (normal wear and tear excepted, and subject to sale in the case of inventory), without representation or warranty by Sellers of any kind, express or implied, including merchantability and fitness for a particular purpose, other than the representation and warranty as to title made by the Sellers in Section 3.5 above.

5.    COVENANTS OF SELLERS

5.1    ACCESS AND INVESTIGATION; DISCLAIMER

5.1. Up to the date hereof, Sellers have and will, and have caused the Company and its Representatives to, (a) afford Buyer and its Representatives and prospective lenders and their Representatives (collectively, "Buyer's Advisors") full and free access to the Company's personnel, properties, contracts, books and records, and other documents and data, and (b) have furnished Buyer and Buyer's Advisors with such additional financial, operating, and other data and information as Buyer may have reasonably requested.

5.2    OPERATION OF THE COMPANY THROUGH CLOSING

Between the date of this Agreement and the Closing Date, Sellers will cause the Company to conduct business only in the ordinary course of business.

5.3    SUPPLEMENTAL DISCLOSURES; EFFECT

5.3.1    From time to time after the execution of this Agreement until the Closing, Sellers may deliver to Buyer one or more Supplemental Disclosure Letters setting forth all changes in the Disclosure Letter (and in previously delivered Supplemental Disclosure Letters if any) arising out of matters discovered or occurring after the date of this Agreement but prior to the Closing Date. Each Supplemental Disclosure Letter shall be accompanied by information related to the newly disclosed matter necessary to adequately evaluate such matter and shall identify representations and warranties or parts of the Disclosure Letter affected by such information or matter. Supplemental Disclosure Letters shall not be deemed breaches of this Agreement, and shall be deemed to be a part of the original Disclosure Letter for all purposes hereunder, including the accuracy and timeliness of the representations and warranties on the date thereof, unless objected to by Buyers as provided in subsection 5.3.2.

5.3.2    Buyers shall have five (5) business days after delivery of any Supplemental Disclosure Letter, together with information related to the newly disclosed matter necessary to adequately evaluate such matter to advise Sellers of any objection that it may have to the new information set forth in the Supplemental Disclosure Letter. If the Closing has been scheduled for a date within such five (5) business day review period, such Closing (and the Closing

9

Date) shall be delayed until the end of the review period unless Buyer waives such review period or any portion thereof. If Buyer so objects, then Seller may (i) elect to terminate the Agreement without liability on the part of either party pursuant to Section 19.1(e), or (ii) elect to proceed to Closing and extend its obligation to indemnify Buyers under Section 10.2 to cover any loss, liability, claim, damage, expense (including reasonable attorneys' fees) or diminution of value arising from or attributable to the matters disclosed in the Supplemental Disclosure Letter, subject to all of the requirements and limitations on indemnification provided for in Section 10. However, if the aggregate amount of loss, liability, claim, damage, expense (including reasonable attorneys' fees) or diminution of value likely to arise from all such matters disclosed by Seller should exceed the Seller's Indemnification Excess Threshold in Section 10.6, then prior to the end of the relevant five (5) business day review period Buyer may elect to terminate the Agreement without liability on the part of either party pursuant to Section 9.1(e).

5.3.3 In the event that Buyer becomes aware prior to the Closing of any changed circumstances, errors, or omissions that would cause any of the representations and warranties of the Sellers under this Agreement to be untrue or misleading, the Buyer shall notify the Sellers in writing of the changed circumstance, error, or omission promptly after discovery so that it may be noted in a Supplemental Disclosure Letter or Schedule. Otherwise, the Buyer shall be deemed to have waived (i) any rights to indemnification or other recovery from Sellers based on those changed circumstances, errors, or omissions or (ii) any rights to object to any indemnification claim by the Sellers based on such changed circumstances, error, or omissions on the grounds of the Buyer's knowledge of such matter.

5.5     NOTIFICATION

Between the date of this Agreement and the Closing Date, the Sellers will promptly notify Buyer in writing if the Sellers become aware of any fact or condition that causes or constitutes a breach of any of Sellers representations and warranties as of the date of this Agreement, or if the Sellers become aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition. Should any such fact or condition require any change in the Disclosure Letter if the Disclosure Letter were dated the date of the occurrence or discovery of any such fact or condition, the Seller will promptly deliver to the Buyer a supplement to the Disclosure Letter specifying such change. During the same period, the Sellers will promptly notify the Buyer of the occurrence of any breach of any covenant of the Sellers in this Section 5 or of the occurrence of any event that may make the satisfaction of the conditions in Section 7 impossible or unlikely.

5.6    BEST EFFORTS

Between the date of this Agreement and the Closing Date, Sellers will use their commercially reasonable best efforts to cause the conditions in Sections 7 and 8 to be satisfied.

6.    COVENANTS OF BUYER

6.1    APPROVALS OF GOVERNMENTAL BODIES

As promptly as practicable after the date of this Agreement, Buyer will make all filings required by legal requirements to be made by it to consummate the transactions contemplated by this Agreement.  Between the date of this Agreement and the Closing Date, Buyer will cooperate with Sellers with respect to all filings and recordings that Sellers may be required by legal requirements to make in connection with the transactions contemplated by this Agreement, and (ii) cooperate with Sellers in obtaining all consents required to be obtained by Sellers; provided that this Agreement will not require Buyer to dispose of or make any change in any portion of their businesses or to incur any other burden to obtain a governmental authorization.

6.2    BEST EFFORTS

Except as set forth in the proviso to Section 6.1, between the date of this Agreement and the Closing Date, Buyer will use its commercially reasonable best efforts to cause the conditions in Sections 7 and 8 to be satisfied.

6.3 POST CLOSING WINE PURCHASES

In addition to the Purchase Price for the Units, for a period of ten years after the Closing: (a) Buyer shall deliver to the Sellers (who are affiliates of Sycamore Vineyards which is a premier vendor of grapes to the Company) six cases of each bottling of wine produced by the Company, its successors, or affiliates, which bottlings designate the Sycamore Vineyard name. and (b) Sellers shall be entitled to purchase for their personal use additional cases of each wine produced by the Company at a purchase price of 50% of the normal retail price.

7.    CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to purchase the Units and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

11                                                    5

7.1     ACCURACY OF REPRESENTATIONS

7.1.1 All of Sellers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must be accurate in all material respects as of the Closing Date as if made on the Closing Date, after giving effect to any Supplemental Disclosure Letter.

7.2     SELLER'S PERFORMANCE

7.2.1 All of the covenants and obligations that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing Date (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

7.2.2 Each document required to be delivered pursuant to Section 2.1 must have been delivered, except for any which have been waived by the Buyers.

7.3     CONSENTS

Each of the Consents, if any, identified in the Disclosure Letter must have been obtained and must be in full force and effect, except for any which have been waived by the Buyer.

7.4     ADDITIONAL DOCUMENTS

Sellers shall have delivered to Buyer such other documents as Buyer may reasonably request for the purpose of (i) evidencing the accuracy of any of Sellers' representations and warranties, (ii) evidencing the performance by either Seller of, or the compliance by either Seller with, any covenant or obligation required to be performed or complied with by such Seller, (iii) evidencing the satisfaction of any condition referred to in this Section, or (iv) otherwise facilitating the consummation or performance of any of the transactions contemplated by this Agreement.

7.5     NO PROCEEDINGS

Since the date of this Agreement, there must not have been commenced or threatened against Buyer, or against any person affiliated with Buyer, any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the transactions contemplated by this Agreement, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the transactions contemplated by this Agreement.

7.6     NO CLAIM REGARDING UNIT OWNERSHIP OR SALE PROCEEDS

There must not have been made or threatened by any person any claim asserting that such person (a) is the holder or the beneficial owner of, or has the right to

12

acquire or to obtain beneficial ownership of, any Unit, or any other voting, equity, or ownership interest in, any of the Company, or (b) is entitled to all or any portion of the Purchase Price payable for the Units.

### 7.7    NO PROHIBITION

Neither the consummation nor the performance of any of the transactions contemplated by this Agreement will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any person affiliated with Buyer to suffer any material adverse consequence under any applicable legal requirement or order.

### 8.    CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE

Sellers' obligation to sell the Units and to take the other actions required to be taken by Sellers at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Sellers, in whole or in part):

### 8.1    ACCURACY OF REPRESENTATIONS

All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must be accurate in all material respects as of the Closing Date.

### 8.2    BUYERS' PERFORMANCE

8.2.1  All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

8.2.2  Buyer must have delivered each of the documents and payments required to be delivered by Buyer pursuant to Section 2.2, except for any which have been waived by the Sellers.

### 8.3    CONSENTS

Each of the Consents identified in the Disclosure Schedule must have been obtained and must be in full force and effect, except for any which have been waived by the Sellers.

### 8.4    ADDITIONAL DOCUMENTS

Buyer must have caused to be delivered to Sellers such other documents as Sellers may reasonably request for the purpose of (i) evidencing the accuracy of

any representation or warranty of Buyer, (ii) evidencing the performance by Buyer of, or the compliance by Buyer with, any covenant or obligation required to be performed or complied with by Buyer, (iii) evidencing the satisfaction of any condition referred to in this Section, or (iv) otherwise facilitating the consummation of any of the transactions contemplated by this Agreement.

### 8.5    NO INJUNCTION

There must not be in effect any legal requirement or any injunction or other order that (a) prohibits the sale of the Units by Seller to Buyer, and (b) has been adopted or issued, or has otherwise become effective, since the date of this Agreement.

### 9..    TERMINATION

### 9.1    TERMINATION EVENTS

This Agreement may, by notice given prior to or at the Closing, be terminated:

9.1.1  by either Buyer or Sellers if a material breach of any provision of this Agreement has been committed by the other party and such breach has not been waived, or if one or more of the conditions to the other party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement;

9.1.2  (i) by Buyer if satisfaction of any of the conditions in Section 7 is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date; or (ii) by Sellers if satisfaction of any of the conditions in Section 8 is or becomes impossible (other than through the failure of Sellers to comply with their obligations under this Agreement) and Sellers have not waived such condition on or before the Closing Date.

9.1.3  by mutual consent of Buyers and Seller; or

9.1.4  by either Buyer or Sellers if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before March 15, 2005, or such later date as the parties may agree upon.

### 9.2    EFFECT OF TERMINATION

If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in Sections 11.1 Expenses, 11.3 Confidentiality, and 11.6 Arbitration will survive; provided, however, that if this Agreement is terminated by a party because of the breach of the Agreement by the other party or because one or more of the conditions to the

terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired and the party who breached the representation, warranty or covenant shall be liable to the other parties for damages, including, without limitation, all costs and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement.

10.  INDEMNIFICATION.

10.1  INDEMNIFICATION BY SELLERS

The Sellers jointly shall indemnify, defend, and hold harmless Buyer in respect of any and all claims, losses, damages, liabilities, penalties, interest, and expenses (including, without limitation, settlement costs and (in the case of third party claims) any reasonable legal, accounting and other expenses of defending any actions or threatened actions) reasonably incurred by Buyers in connection with each and all of the following:

10.1.1 A breach of any representation or warranty made by Sellers in this Agreement;

10.1.2 A breach of any covenant, agreement or obligation of Seller contained in this Agreement or any other instrument contemplated by this Agreement;

10.2  INDEMNIFICATION BY BUYER

Buyer shall indemnify, defend, and hold harmless Sellers in respect of any and all claims, losses, damages, liabilities, penalties, interest, and expenses (including, without limitation, settlement costs and (in the case of third party claims) any reasonable legal, accounting or other expenses for investigating or defending any actions or threatened actions) reasonably incurred by Seller in connection with each and all of the following:

10.2.1 A breach of any representation or warranty made by Buyer in this Agreement;

10.2.2 A breach of any covenant, agreement or obligation of Buyer contained in this Agreement or any other instrument contemplated by this Agreement;

15

s

10.2.3 Any claims against, or liabilities or obligations of Sellers arising from the ownership or operation of the Company that does not constitute a breach of Sellers' representations and warranties in this Agreement.

10.3   CLAIMS FOR INDEMNIFICATION

Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "Indemnified Party") shall promptly notify the other party (the "Indemnifying Party") of the claim and, when known, the facts constituting the basis for such claim. In the event of any claim for indemnification hereunder resulting from or in connection with any claim or legal proceedings by a third party, the notice to the Indemnifying Party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.. The Indemnified Party shall not settle or compromise any claim by a third party for which it is entitled to indemnification hereunder, without the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld) unless suit shall have been instituted against it and the Indemnifying Party shall not have taken control of such suit after notification thereof as provided in Section 11.4 of this Agreement.

10.4   MITIGATION

Each party will act in good faith and in a commercially reasonable manner to mitigate any damages it may suffer. Each party will fully cooperate with the other in the investigation, defense, settlement, or prosecution of any claim, litigation, or proceeding already instituted or which may be instituted hereafter against or by such party relating to or arising out of the ownership and operation of the Company (other than claims, litigation, or proceedings arising out of the transactions contemplated by this Agreement). The party requesting such cooperation shall pay the out-of-pocket expenses (including legal fees and disbursements) of the party providing such cooperation, and of its officers, directors, employees and agents, reasonably incurred in connection with providing such cooperation, but shall not be responsible to reimburse the party providing such cooperation for the salaries or costs of fringe benefits or other similar expenses paid by the party providing such cooperation to its officers, directors, employees and agents while assisting in the defense or prosecution of any such litigation or proceeding.

10.5   MANNER OF INDEMNIFICATION

The amount of indemnification owed by one party to the other pursuant shall be determined (a) by agreement of the parties or (b) by arbitration as provided in this Agreement. All indemnification hereunder shall be made by payment of cash or delivery of a certified or official bank check in the amount of the indemnification liability.

10.6   LIMITATIONS ON INDEMNIFICATION

10.6.1 Time Limits on Claims. All representations and warranties made by the parties herein or in any instrument or document furnished in connection

16

herewith shall survive the Closing and any investigation at any time made by or on behalf of the parties hereto and shall expire on the second anniversary of the Closing Date, except (i) the representations and warranties set forth in Section 3.9 "Taxes" which shall expire at the end of the applicable statutes of limitations for such taxes, and (ii) as to any matter as to which a claim is submitted in writing to the Indemnifying Party prior to such second anniversary and identified as a claim for indemnification pursuant to this Agreement. No claim or action for indemnity pursuant to this Section 10 for breach of any representation or warranty shall be asserted or maintained by either party hereto after the expiration of such representation or warranty pursuant to the preceding sentence except for claims made in writing prior to such expiration and actions (whether instituted before or after such expiration) based on any claim made in writing prior to such expiration.

10.6.2 Indemnification Threshold.  An Indemnifying Party shall not be obligated to pay indemnification obligations to the Indemnified Party under Sections 10.1 and 10.2 until the aggregate amount of indemnification obligations otherwise payable exceeds Fifty Thousand Dollars ($50,000.00), but once that threshold is reached indemnification shall be from the first dollar of Claims.

10.6.3 Certain Other Limitations.  No indemnified party shall be indemnified, or have any other recovery, for damages arising from any inaccuracy in, or a breach of, any representation, warranty, covenant or agreement by the Indemnifying Party if the Indemnified Party had actual knowledge at or before the Closing of the facts as a result of which such representation, warranty, covenant or agreement was inaccurate or breached.  For purposes of this subsection, the Buyers shall be deemed to have actual knowledge of any such facts actually known to any of the Buyer's managers if such knowledge would have led a reasonable person to conclude that a representation, warranty, covenant or agreement was inaccurate or breached (assuming that each such person had read the representations and warranties and discussed their meaning with the Buyer's counsel).  Notwithstanding any other provision of this Agreement, the Sellers shall not be liable to the Buyer for any claim to the extent that it relates to any act or omission of the Buyer or any of its affiliates or the agents of any of them.

10.7    INDEMNIFICATION EXTENDS TO OTHERS, LIMITATION OF LIABILITY

The indemnification benefits afforded to the parties in this Section 10 extend to their respective officers, directors, unit holders, managers, affiliates, employees, agents, successors, and permitted assigns.  Notwithstanding anything in this Agreement to the contrary, in no event shall either party be liable to the other for consequential, punitive, special, or incidental damages, lost profits, lost revenues, lost opportunity costs, or costs of financing.

10.8    INDEMNIFICATION AS EXCLUSIVE REMEDY

The indemnification provisions of this Section 10 shall be the exclusive remedy for claims asserted by the parties against one another for the matters specifically

17

5

identified in this Section 10. This shall not, however, limit the right of a party to seek and obtain equitable relief (including specific performance) to enforce the performance of this Agreement or of any contract, document, or other instrument executed and delivered pursuant to it.

## 11.    GENERAL PROVISIONS

### 11.1    EXPENSES

Except as otherwise provided in this Agreement, all fees, costs and expenses incurred by Buyer or Sellers in connection with the preparation, execution, and performance of this Agreement and the transactions contemplated by this Agreement (including costs of their respective attorneys, accountants, and business advisors) shall be borne by the party incurring the same or as specifically provided in this Agreement. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

### 11.2    PUBLIC ANNOUNCEMENTS

Sellers and Buyer agree that press releases and other announcements to be made by either of them with respect to the transactions contemplated hereby shall be subject to mutual agreement of the parties.

### 11.3    CONFIDENTIALITY

Between the date of this Agreement and the Closing Date, Buyer and Sellers will maintain in confidence, and will cause the directors, officers, managers, unit holders, employees, agents, and advisors of Buyer and the Company to maintain in confidence, and not use to the detriment of another party or the Company any written, oral, or other information obtained in confidence from another party or the Company in connection with this Agreement or the transactions contemplated under it, unless (a) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the performance of the parties obligations hereunder, or (c) the furnishing or use of such information is required by or necessary or appropriate in connection with legal proceedings. If the purchase of the Units is not consummated, each party will return or destroy as much of such written information as the other party may reasonably request.

### 11.4    NOTICES

All notices, requests, demands, and other communications hereunder shall be in writing and shall be delivered personally, or sent by receipted next business day

5

courier service, to the parties or their successors in interest at the following addresses, or at such other addresses as the parties may designate by written notice in the manner aforesaid:

|  |  |
|---|---|
| If to Buyer: | Connaught Capital Partners, LLC |
|  | P.O. Box 410 |
|  | St Helena, CA 94574 |
|  | Telephone: 707 963 9694<br>FAX: 707 963 0554 |
| If to Sellers: | John M. Bryan<br>600 Montgomery Street , 35th Floor<br>San Francisco CA 94111<br>Telephone 415-421 9990<br>FAX 415-421-0471 |
| With copy to: | Norman A. Zilber<br>Bancroft & McAlister LLP<br>650 California Street<br>25th Floor<br>San Francisco CA 94108<br>Telephone 415-781-8855<br>FAX 415-951-8855 |

11.5     GOVERNING LAW

This Agreement will be governed by the laws of the State of California without regard to conflicts of laws principles.

11.6     ARBITRATION; ATTORNEYS FEES; JURISDICTION

11.6.1 Election of Arbitration. In the event any dispute between the parties cannot be resolved within thirty (30) days by good faith negotiation, either party may submit the dispute for resolution by final and binding arbitration before a single arbitrator with the JAMS arbitration service in San Francisco, California. The parties shall attempt to agree on the appointment of a single arbitrator, and if they cannot agree on a single arbitrator, then the arbitrator shall be selected by JAMS.

11.6.2 Conduct of Arbitration and Decision.    The arbitration shall proceed in accordance with the commercial arbitration rules then in effect of JAMS. The arbitrator shall be qualified by experience and training as to the subject matter of

the dispute. The arbitrator shall issue a reasoned opinion of decision, citing applicable law. The written decision of the arbitrator shall be final and binding upon the parties and in such form that judgment may be entered in and enforced by any court having jurisdiction over the parties.

11.6.3 Costs and Fees. The non-prevailing party shall pay the costs of the arbitration. The prevailing party shall be entitled to prompt reimbursement from the non-prevailing party of reasonable attorneys' fees incurred in connection with such arbitration. The arbitrator shall specify the "prevailing party" and "non-prevailing party" in the decision. If any arbitration embraces more than one dispute and one party is the prevailing party with respect to one but not all of such disputes, the arbitrator shall apportion the costs and expenses, and the reasonable attorneys' fees incurred by the parties to the separate disputes embraced by the proceeding, and thereby equitably determine the amount thereof to be borne by each party. If for any reason the preceding sentence is held to be not legally enforceable, then no attorneys' fees shall be recoverable by the prevailing party under this Agreement.

11.6.4 Consent to Jurisdiction. Each of the parties hereby consents to the jurisdiction of the courts of the State of California, County of Napa, (and of the appropriate appellate courts) in any appropriate action or proceeding involving this Agreement. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

11.6.5 Consent to Service of Process. Sellers hereby agree and consent that service of process may be made for all purposes under this Agreement in care of the individual and the address designated to receive notices to the Sellers which are then in effect under this Agreement.

11.7     FURTHER ASSURANCES

The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

11.8     WAIVER

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or

20

renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

11.9    ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

11.10    ASSIGNMENTS, SUCCESSORS, AND NO THIRD-PARTY RIGHTS

Neither party may assign any of its rights under this Agreement without the prior consent of the other parties.  Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

11.11    TAX RETURNS

11.11.1    The Company's CPA will prepare and the Company shall file the full year 2004 U.S. federal and California income tax returns for the Company, subject to Sellers' prior review and approval.  The Company shall be responsible for payment of California sales taxes on the Company owed for the period through the Closing Date., the Sellers shall be responsible for their percentage share of any federal and state income taxes that may result from income of the Company to the Closing Date and Buyer shall be responsible for payment of taxes for any activities conducted by the Buyer through the Company for the period after the Closing Date. The parties elect under Internal Revenue Code Section 706 to allocate the Company's income or loss for 2005 to the Sellers and Buyer as if the year closed at the time of this sale under the monthly closing convention. The parties are not electing to allocate the income and loss on a daily basis of the annual income. Any allocation to be used requires the prior written approval of the Sellers..

11.11.2    From and after the Closing Date, to the extent reasonably requested by any party hereto, each party hereto shall (i) cooperate fully in the preparation of tax returns required for the Company, (ii) provide, or cause to be

21

provided, any records and other information requested by such parties in connection therewith, as well as access to, and the cooperation of, the auditors of such party, at the sole cost and expense of the party making such request, and (iii) cooperate fully in connection with any tax investigation, audit or other proceeding. Any information obtained pursuant to this Section or pursuant to any other Section hereof providing for sharing of information or the review of any tax return or other Schedule relating to taxes shall be treated as confidential information.

### 11.12    CONTINUED AVAILABILITY OF COMPANY RECORDS

Buyer agrees, for itself, its successors, and assigns, that for a period of seven (7) years after Closing, the Sellers and their designated legal and accounting representatives shall be permitted access to the books and records of the Company for the period up through Closing (and for such subsequent periods as may be necessary for the Sellers to comply with tax and other regulatory reporting purposes). Access shall be provided by prior advance arrangement, during regular business hours.

### 11.13    SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 11.14    SECTION HEADINGS, CONSTRUCTION

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

### 11.15    TIME OF ESSENCE

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

### 11.16    COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[Signatures begin next page]

23                                               s

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

SELLERS

John M. and Florence E. Bryan Trust

By_____
    John M. Bryan, Co-Trustee

By_____
    Alan R. Brudos, Co-Trustee


J. M. Bryan Family Trust


By_____
    John M. Bryan, Trustee



BUYER

Connaught Capital Partners, LLC

By _____
    Kulwinder Sidhu, its Manager

23

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

SELLERS

John M. and Florence E. Bryan Trust

By _____
     John M. Bryan, Co-Trustee

By _____
     Alan R. Brudos, Co-Trustee


J. M. Bryan Family Trust


By _____
     John M. Bryan, Trustee


BUYER

Connaught Capital Partners Investments, LLC


By _____
     Kulwinder Sidhu, its Manager

24                          REDLINED 02/02/05

Schedule 1.1 to
Unit Purchase Agreement
Of the Bryan Trusts

| Seller | Number of Units | Sales Price |
|---|---|---|
| John M. and Florence E. Bryan Trust | 4080 | $4,186,050 |
| John Bryan Family Trust | 4377.78 | 4,491,560 |
| Total | 8457.78 | $8,677,610 |

DISCLOSURE LETTER

UNITS PURCHASE AGREEMENT

BRYAN TRUSTS

3.9  Liabilities Outside Ordinary Course

Legacy increased its real estate secured Term Loan with the Mechanics Bank in July 2004 by $6,000,000 in part to cover the payoff of notes to the Freemark Abbey Limited Partnership in the amount of $4,638,720, and capital expenditures of $389,130 for wine barrels, $132,130 for improvements to the winery complex and $118,485 for new winery and office equipment.

Legacy renewed its Line of Credit with Mechanics Bank in June 2004 with a borrowing limit of $7,000,000.

In connection with a major landscaping project at the winery complex, there is a current contract with Euser Price Landscape Service for $356,171 of which $50,377.50 has been paid.  In addition Jonathan Plant & Associates have been engaged to supervise and coordinate the project along with providing plants for additional amounts of $20,000 to $24,000 of which $5,772 have been paid. There will be about $5,000 to $10,000 in additional change orders to replace old drainage and sewer lines in the garden.

## ASSIGNMENT

John M. Bryan, Trustee of the J. M. Bryan Family Trust, does hereby assign, convey and transfer to Connaught Capital Partners Investments LLC, a California limited liability company, all of the undersigned's right, title and interest in and to its ownership units and interests in Legacy Estate Group LLC, a California limited liability company.

Executed to be effective on March 1, 2005

J.M. Bryan Family Trust

By _____
    John M. Bryan, Trustee

## ASSIGNMENT

John M. Bryan and Alan R. Brudos, Trustees of the John M and Florence E. Bryan Trust, do hereby assign, convey and transfer to Connaught Capital Partners Investments LLC, a California limited liability company, all of the undersigned's right, title and interest in and to its ownership units and interests in Legacy Estate Group LLC, a California limited liability company.

Executed to be effective on March 2005

John M. and Florence E. Bryan Trust

By _____
John M. Bryan, Trustee

By _____
Alan R. Brudos, Trustee